## Pierce v. Crisp.

(Decided Oct. 1, 1935.)

520

WAUGH & HOWERTON and LOVEL H. LILES for appellant.

JOHN F. COLDIRON and JAMES ATKINSON for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The petition of the appellant, Ernest Pierce, sought

damages of the appellee, George Crisp, for the alienation of his wife's affections. Amendments added a cause of action for criminal conversation. No motion to elect was made. The answer was a denial, except an admission of adultery with the plaintiff's wife and an allegation that he had connived at and consented thereto. The defendant further pleaded that the plaintiff and his wife had been living separate and apart because of his cruel treatment; that she had been engaged in promiscuous prostitution with his consent and at his connivance; also that she had obtained a divorce without his having made any defense; and that by reason of his cruel treatment and the divorce the plaintiff was barred from maintaining the action. A demurrer to the answer was overruled and issues joined. The verdict was for the defendant.

The first instruction advised the jury that, as the adultery was admitted, they should find for the plaintiff compensatory damages. There was no qualification or provision that the jury should find otherwise, even if they should find under Instruction No. 2. That instruction, also without qualification, advised the jury, if they should believe from the evidence that the plaintiff had connived at the sexual intercourse between his wife and the defendant and consented thereto, either actively or passively, they should find for the defendant. The principal ground upon which a reversal of the judgment is asked is that there was no evidence authorizing the second instruction. Appellant concedes it was proper not to instruct on the issue of alienation of affections.

In January, 1933, the woman sent word to the defendant, Crisp, who was then the sheriff of Greenup County, that she wanted to see him. Their illicit relations commenced then and continued until within a day or so of the trial, as was freely admitted by both of them on the witness stand. Crisp had a wife and several children and grandchildren. His wife is the plaintiff's greataunt. So far as the suit is concerned, the conduct of the parties after the divorce in September, 1933, is not to be regarded. Before the two testified, the plaintiff had proven a number of specific occasions establishing their illicit intimacy. The evidence, therefore, is to be considered only in relation to the issue of connivance or consent on the part of the husband to his wife's profligacy.

The Pierces were married when quite young, in 1925, and a child was born to them in 1926. They had been living at his parent's home. He lost his job as a railroad brakeman in January, 1930, and was unable to find work. His testimony is that in August, 1930, his wife went with their child to her parent's home four or five miles away, and a little later she filed a suit for divorce upon the ground of cruel treatment. He filed a demurrer to the petition and the suit lay dormant until September, 1933. On cross-examination the plaintiff testified that in the latter part of 1930 he heard that his wife was keeping company with one Aliff, who it appears from the record was of bad character. On two or three occasions he had gone in search of his wife, but, when he found her with Aliff, her father or others were present. With one exception the places were public. On that occasion he came upon them at what is called the "Old Orchard." His wife's sister and his sister and another man were with them. He stated that he was looking after his child, who it seems was frequently taken out by her mother; that he never saw anything wrong between Aliff and his wife, and that after their association he and his wife resumed their marital relations in 1931, although she continued to live at her father's home. He did not support her during 1931 and 1932 he said, because he was out of a job. Three letters written by Mrs. Pierce to her husband in 1932 were filed in evidence. While not couched in endearing terms, they were very friendly and contained invitations to Pierce to come over to see her on designated days. Mrs. Pierce testified that, on account of her husband's nonsupport and cruelty, she was compelled to leave him in August, 1930. They never cohabited afterward although they were friendly. He would come to her home sometimes two or three times a week to see the baby and she would go to his father's home to get him to go to the show with her. They went bathing, cherry picking, and elsewhere together.

The defendant established that during this period and perhaps after the beginning of the woman's association with him, she went about at night with different men, particularly with Aliff, who was known as her sweetheart. But it was developed that on each occasion described in the evidence there were others with them. As to a few instances there is evidence of specific circumstances from which the woman's adultery is all but

expressly proven. At least two of these occasions were in 1929 before the parties separated. The point is not whether the wife was guilty of lascivious conduct or even of promiscuous adultery; it is whether there was active or tacit consent to her living that sort of life. On this point we may state the evidence in detail.

Albert Brown testified that in 1929 Pierce, who had just come in from work, came to his restaurant with his brother and wanted to borrow witness' car to follow his wife. He did not let him have it. The reason for his refusal doubtless was that on two occasions in 1929 he and another man had had Pierce's wife and sister out in the woods at night. Orville Mullins and wife, who were neighbors of Mrs. Pierce's father, testified that some time in 1929 or 1930 Pierce came to their house and asked Mullins to go with him to follow his wife and see where she was going. Mullins put his family in his automobile and did so. Pierce stated that he was going to find out something and get a divorce and take the little girl. They kept in sight of the other car and came upon the wife, her father, baby, and sister-in-law and an unidentified man at one of the principal public corners in Ashland. Pierce tried to take his child and there was an argument. The father and the man, who apparently was Aliff, had left the car. Thelma Hannah testified that in September, 1932, she and Mrs. Pierce and her child and two young men were walking home from church when Pierce came over a fence with a pistol in his hand. Mrs. Pierce's escort ran. The witness had seen nothing wrong between them, and there were a number of people along the road. The testimony of Donald Crum, who was with Miss Hannah on the occasion mentioned, is to the same effect; and further that Pierce said he wanted to take the child, who was with them. Amos Allen deposed that in 1930 Pierce and his father asked him to take them to Ashland. He said "he didn't give a damn for the woman but he wanted the kid." They located the wife as she and an unidentified young man entered a picture show. M. L. Hutchinson, a police officer, testified that Mrs. Pierce one time came to the jail to see Aliff, who was a prisoner. Pierce came there looking for his wife. He was very angry, and they left together quarreling. In 1930 or 1931 Pierce obtained a warrant of arrest for somebody not disclosed in the evidence. He accompanied the deputy

sheriff in serving it, and said to him that he did not care about the woman but he wanted his child. The officer testified that he brought two men and two women, one of whom was Mrs. Pierce, into the station, but they were never tried. There is no evidence as to what the arrest was for. The plaintiff had been asked about these several instances and perhaps others when he had gone to look for his wife. He denied having observed anything wrong and having any idea of her immoral relations. He admits that he was more concerned about his child on these occasions. Mrs. Pierce testified to some of the instances of misconduct indicated by the above witnesses, but stated that her husband did not know anything about them so far as she was aware and had never said anything to her about her conduct. However, she testified he knew of her association with these men before she met Crisp, and said he did not care what she did but he wanted the child. This conversation manifestly was incompetent. Such is all the evidence on the point of knowledge and consent of the husband to her common prostitution.

As to the wife's relation with Crisp, Pierce testified that he had heard she was going with him, and on the night of May 27, 1933, from across the street he saw them in a hotel bedroom in Ashland. He did not then call an officer, but later one told him he could do nothing about it. Crisp testified that on this occasion he and Mrs. Pierce were visiting a girl who stayed at the hotel; that she was in the room all the while and there was no misbehavior there. In June following Pierce saw them together late at night in a parked car at the race track, which seems to have been a favorite rendezvous. He started to get out of his car and was restrained by his companion, while Crisp and his wife drove away. The defendant testified that he made no effort to keep Pierce from knowing of his relations with his wife, bnt could not say that he knew of them.

The mere fact that a husband and wife were living apart at the time of her adultery does not prevent the husband from maintaining an action for criminal conversation if he has not renounced his marital rights; nor is the subsequent divorce a bar to the action for prior illicit conduct. It is not material that the defendant was led into the adulterous relation through the acts and practices of the woman instead of himself be-

ing the seducer. Such are the general views of the courts, although there is authority to the contrary. 12 R. C. L. 1488; 30 C. J. 1156; 8 American and English Enc. 263; annotations, 68 A. L. R. 581; Peek v. Traylor, 34 S. W. 705, 17 Ky. Law Rep. 1312; Merritt v. Cravens, 168 Ky. 155, 181 S. W. 970. A husband's connivance at the adulterous relation will bar him from maintaining an action against his wife's paramour. Connivance is literally "a winking at"; voluntary blindness; an intentional failure to discover or prevent the wrong; forbearance or passive consent. Webster's New International Dictionary; 12 C. J. 508. But a corrupt intent in the mind that another party should commit the offense is an essential element of connivance. Connivance or consent may be established by proof of passively permitting the misconduct as well as actively procuring its commission. "If the mind consents, that is connivance." Dennis v. Dennis, 68 Conn. 186, 36 A. 34, 36, 34 L. R. A. 449, 50 Am. St. Rep. 95. There is no evidence establishing consent to or connivance at the particular meretricious relations of the plaintiff's wife and the defendant. But that is not necessary to the defense, for, if the husband suffers his wife to live as a prostitute so as to amount to a general license to conduct herself improperly with any one, he can have no action therefor; it being damnum absque injuria. 13 R. C. L. 1489; 30 C. J. 1155; Cook v. Wood, 30 Ga. 891, 76 Am. Dec. 677. But it has been held the fact that the husband's consent to his wife's misconduct with other men short of living openly and publicly in a state of common prostitution is not a bar. Sanborn v. Neilson, 4 N. H. 501. While the presumption of the law is in favor of honesty and correctness of purpose, nevertheless the conduct of the husband when subjected to the test of reasonable human transactions, as where it is such that a rational mind can draw a conclusion therefrom, the evidence may be sufficient to show connivance or consent. 13 R. C. L. 1489. The annotations in 68 A. L. R. 575, present a number of cases where the facts were held to show connivance, but none of them are like the facts before us. On the other hand, it is shown in those annotations to be generally held that a husband may watch his wife when he suspects her of infidelity, and may even leave open opportunities which he finds so long as he does not make new ones or invite the wrong.

While doubtless the plaintiff sensed and realized the situation to the extent that it could be said he knew that his wife was unfaithful to him, measured by the foregoing rules of the law the proof does not show any consent, either active or tacit, to her living a life of prostitution. Rather there was pursuit and a militant interference, notwithstanding the evidence of statements that he cared nothing for her and was concerned only about his child. The evidence tends to show that she confined her immorality to Crisp alone after she met him, and there is an entire absence of proof showing consent to that relation. It looks more like knowledge and helplessness than knowledge and consent. We therefore conclude that the court was in error in giving instruction No. 2.

It is further maintained by the appellant that evidence of his wife's unchaste conduct with other men was incompetent. Evidence·of particular acts of infidelity as well as the spouse's specific reputation may be introduced in mitigation of damages in an action for criminal conversation, for it is plain that if the wife was incontinent before the commission of adultery with the defendant, the damage sustained by the plaintiff from the defendant's wrong is trifling compared to what it would otherwise be. Dorman v. Sebree, 52 S. W. 809, 21 Ky. Law Rep. 634; Matusak v. Kulczowski, 295 Pa. 208, 145 A. 94, 68 A. L. R. 557; 8 Am. and English Enc. of Law, 271.

The judgment is reversed.